Vivian Hoard, I would like to focus on two primary errors that the court committed. The first one being the court's error in failing to conclude that this easement qualified as a relatively natural habitat for rare, endangered, and threatened species. And the court's error in failing to conclude that this habitat did not qualify as open space for the scenic enjoyment of the general public that provides a significant public benefit. And I'll concentrate on the habitat regulation first. All the code requires is that a donation of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystems be donated to qualify for conservation purpose. That definition in the code is basically what we learned in fifth grade earth science as to what an ecosystem is. It's where a suite of species co-inhabit a particular habitat of the land. While we believe the addition of the word significant in the regulations heightens the test for qualifying as a relatively natural habitat, we have covered that extensively in the brief. So what I want to focus on here is the court's error in ignoring the abundance of evidence of threatened species that inhabit this habitat. The commissioner's expert testified that, quote, no known populations of rare, endangered, or threatened species occurred within the easement. Yes, Your Honor, but tab 53... Is that a, I mean, is that a finding of fact that we apply a clearly erroneous standard of review to? No, no, Your Honor. In this case, the court erred in what it defined as a rare, endangered, or threatened species. Here, the court conflated the terms rare as meaning threatened and endangered, and that's not what the code means. It means do you have a rare species, an endangered species, or a threatened species? And I'd like to point the court to tab 53, page 587, where Dr. Noss admits he restricted his report to only rare species. Now, what Dr. Noss was referring to was the Nature Serves Species Assessment Database, and that assessment database, Nature Serve, has come up with five different species rankings. G1 means there's five of them left on the planet that scientists know about. G2 means there's 20 of them left on the planet that scientists know about. G3 means 80 or 100 that are on the planet that scientists know about. G4s and G5s are listed because they are suffering some sort of external threat, and they're concerned about them. Dr. Noss admitted that anything on the Nature Serve ranking system is something that conservationists are concerned about, and so what the court did when it ruled that there were no rare, threatened, or endangered species on the property, and relying on Dr. Noss, was they basically conflated it and required there to be a rare species, which is simply a G1 or G2 species. Which species is ranked on the easement area? It's the dense flower knotweed, which is ranked on the area, and it has between an S1 and an S3 species ranking, but Mr. Echol, who was the botanist involved, testified that he believed that there were probably less than 20 occurrences on the property, which would render the species a G2 species within the state. I know that this hypothetical is not your case, but let's say that there were a 100 acre conservation easement, and on one-tenth of one acre was a rare or threatened or endangered species. Would that qualify under the statute? Under the statute and the regulations, it should qualify. The goal of the statute is to acquire land for conservation, and there's nothing in the statute or the regulations that addresses the size, whether it's smaller or whether it's larger. In fact, the Sixth Circuit, in the Glass opinion, it was just the opposite argument. The IRS was arguing that the area was too small to qualify, and the Sixth Circuit said no, that there's nothing in the code or the regulations that limits the amount of size that the species may be on. But that's not the situation here, because here we had threatened species that inhabited the entire property, and all you have to do is look to Dr. Noss' testimony and his expert report to find those. And in the past, taxpayers have read the cases as saying, well, you just have to have a threatened species on the property, like to point the court's attention to the case of Butler. In that case, the tax court found that there was a threatened species on the property, not a rare, threatened, or endangered species on the property. I'd like to also point out that the phrase is written in the disjunctive, rare, endangered, or threatened. We could go back to the dense flower knotweed. That only occupies, what, 7.5% of the easement area? Yes, Your Honor. And the golf course was designed so that chemicals that are harmful to that species drain into the small areas of the actual habitat. There's nothing in the record that indicates that over the life of this golf course, any of the maintenance practices have harmed any species on the property. And you can equate that to farmland. Farmland qualifies for conservation purpose. The landscape has been altered to allow for plants. Plants have fertilizer and herbicides, and those types of properties can still qualify. There's nothing inconsistent with recreational use of this property, and also its use as a conservation purpose. I'd like to get back to the threatened species on the property, because I think Dr. Noss, the government's own expert, has admitted that there's threatened species on the entire landscape of this property. Where is that in the record? Can you direct us to where that's in the record? Yes, I can. Dr. Noss acknowledged in his testimony that it's not just G1s and G2s that are threatened or endangered, and that steps to protect those other species should not wait until the species becomes a G1 or G2. That's at tab 53, page 575. Dr. Noss certainly believes G3s are endangered. He admitted on cross-examination, he's petitioning to have the Venus flytrap, the G3 species at issue in Atkinson, which was not reviewed, to have it placed on the threatened and endangered species list. He obviously believes the G3 is endangered. Dr. Noss believes that even G4s and G5s that are declining across their range are threatened, and we should do something to protect them. That's at tab 53, page 560, and also tab 33, his expert report, 99-R, and page 18 and 20. I'd like to really talk about the fox squirrel here. Fox squirrel isn't like the squirrels we have in Atlanta. It's not like a gray rodent with a tail. A fox squirrel, they can be all black, they can be all white, they can be a combination of it. They have fur more like a hamster. They're much larger. I had never seen one until I went to this golf course and I grew up in Georgia. So the fox squirrel is a threatened species. Dr. Noss admitted in his expert report that they have no habitat in the Piedmont region of Georgia. The Piedmont region, if you divide Georgia into three parts, horizontal parts, the Piedmont is the center slice of Georgia. They have no habitat because of fire suppression and development, and they have found refuge on golf courses. Scientists for the government have studied fox squirrels on golf courses. Scientists know that these fox squirrels are declining, and their only habitat that they have is golf courses. Does NatureServe categorize the southern fox squirrel as globally secure? It categorizes it right now as a G5, but all of the experts admitted that these assessment databases are not perfect, and that Dr. Noss even admitted that we can find out a species is in trouble, and by the time we can get it on the threatened or endangered species list, it could be extinct. Can they be hunted in the state of Georgia? Beg your pardon? Can the southern fox squirrel be hunted in the state of Georgia? Yes, it can, Your Honor, and Dr. Noss explained that as well on page, at tab 53, page 557. He explains that the hunting lobbies are strong in most states, and their boards are generally wealthy landowners who like to hunt. They determine policy, not biologists. Noss believes his petition to have the Sherman fox squirrel in Florida placed on the threatened endangered species list resulted in it being removed from the game list. All of the experts acknowledged during the testimony that just because a species is hunted does not mean it's not threatened. If a species has no natural habitat in which to live, we would consider that a threat. I've got a question on a different matter, which is it seems that we've got a lot of discussion about what it means to be a significant habitat, but very little about what it means to be relatively natural. Where did the tax court go to figure out whether something is a relatively natural habitat, and where do we look? What standards have been established for that? You say that farmland can qualify. Under the regulations, farmland can qualify. A golf course would qualify if it was open to the general public under the open space standard. So golf courses can qualify, it's just the court didn't believe that this one met the significant relatively natural habitat purpose, and I'm running out of time. You say golf courses can, I expect he'll let you go over to answer my question. You say that golf courses can qualify, but my question is how do we know if they qualify? Setting aside your arguments about threatened species, how do we know if it's relatively natural? Well, Mr. Wilson and Mr. Echols both in their expert reports pointed out how it's relatively natural. You've changed the suite of plants and animals that might inhabit it, including the birds, but you still have an ecosystem of species that inhabit the area that need the area to live, and I haven't even had time to get into all the bird lists. And what I would like to point out is in Mr. Wilson's expert report, he goes through the significance of the bird list. The court erred in saying you had to be in the top list, the top category, of every one of these bird lists to qualify. But if you read the explanation of what it means to qualify for that bird list, you'll see that all of those birds, the 27 that Mr. Wilson noted on the habitat, are all listed as having threats. They're declining because of threats to their habitat. And in particular, Mr. Wilson discussed the edge species that live on the habitat. There are certain types of birds, the eastern whippoorwill, which is on the U.S. Fish and Wildlife 2008 list as a potential threatened and endangered species, that inhabits the easement. It is an edge species that requires the golf course to survive. The red-headed woodpecker requires the golf course to survive. The fox squirrel requires the golf course to survive. They require the mosaic of the entire landscape because they draw certain elements of their existence from each part. The red-headed woodpeckers live in the bottomland forest, but they forage on the open space in the greens because they can't attack when there's a lot of woods around. The court also ignored the bottomland forest. There are three significant high-priority habitats in this region. The court didn't even address those. The three habitats are high-priority habitats because we're losing them to development and climate change. And I would like to address open space if the court would indulge me because I don't want to lose the opportunity to do so in rebuttal. We'll give you two more minutes. Thank you so much. The court also erred here in holding that the easement failed to qualify for open space because the court erred in its finding of facts saying that the public couldn't get to the easement from the non-riverside, and that simply wasn't the case from the evidence. The Columbia County Planning Directorate, tab 51, page 325, as well as Mr. Echols, testified to the extensive pathworks through this golf course. You can't drive your car on it, but you can certainly walk on it through the extensive path areas. We also believe the court erred as a matter of law in holding that the people surely they don't walk on the golf course. They're sidewalks. They're walking paths around the golf course that you can get down to the river. They've got to be away from the golf course. The golfers go crazy if there are people out there walking. Well, it's not on the golf course. It's around the area. Got it. But it's not just the walking paths through the golf course where the public can view the easement. The easement is on the Savannah River, and the little river cuts off a part of the golf course. So there's a festival every year called the Bender Digger Festival where people take their kayaks and their paddle boards, and you'll have thousands of people. This is a huge recreational area. But didn't my understanding from the record was that the golf course challenged the right of the festival to use that water during a tournament? They didn't challenge the right. During the tournament, they knew that there were going to be thousands of people there going down the little river, and they could be injured by a golf ball being hit. So the issue was safety. So they allowed the festival to go through. No one's ever been prevented from going down the little river. In fact, I don't know that the clients could ever prevent someone going down the little river. But it did present a problem, a logistics problem, and a safety issue the day they had a tournament and the Bender Digger Festival at the same time. But for open space, for the general enjoyment of the general public, this is a tourism area for Augusta. The golf course sits on the Savannah River. The little river runs through it, and along the south is the Yuki Creek and the Yuki Creek Greenway. And so there is over, and if you look at Mr. Eckel's report, there's over 2,500 feet on the Savannah River. There's 4,000 feet on either side of the little river, and there's 1,000 feet contiguous to the riparian forest on the Yuki Creek. And there are many paddle enthusiasts and canoe enthusiasts that use these areas because they are so beautiful. The Sumter National Forest is on the other side. And so if you want to go paddle without paddling by someone sitting on their deck and being hit with a Coca-Cola can on the top of your head, this is where you go to paddle. And it's very important to the people of this area. It provides a significant benefit in terms of tourism to the people of this area. And I would invite the court particularly to take a look at Tab 33, Exhibit 96P. Exhibit 2 is a video that shows a view of the easement area paddling north from the Savannah River up to Clark Hill Reservoir. Exhibit 3 of Exhibit 96P is a view of the little river, and you can see a kayaker going down the little river which bisects the golf course. And then Exhibit 4 is what it looks like downriver with all the houses along the river. So those videos will help you understand how important this area is as open space for the people of this community.  All right. Ms. Briner. Ms. Briner. Good morning, and may it please the court. My name is Nora Briner, and I represent the Commissioner of Internal Revenue in this appeal. In 2010, Champions Retreat, a meticulously maintained golf course, was in financial trouble. It claimed that it was entitled to a nearly $2.5 million deduction based on this easement that we're talking about today that it claims meets the requirements in Section 170H for a qualified conservation contribution. The testimony at trial showed that Champions thought the deduction would attract investment from new partners by having a valuable deduction to pass through to those partners. Now, taxpayers can consider tax consequences in planning their affairs. That's certainly allowed. But in order to benefit from this $10.5 million deduction, Champions must show that the easement was contributed exclusively for one of the conservation purposes in Section 170H. The tax court did not commit clear error in holding that conservation was not, in fact, Champions Retreat's exclusive purpose in contributing this easement. Substantial evidence supported the tax court's underlying factual findings that none of the animal species on which Champions Retreat relies is rare, threatened, or endangered. Let me tell you the concern that I have about the tax court's decision. Yes, Your Honor. And I'm looking at the decision itself, and it relies on Champions' experts, Mr. Echols and Mr. Wilson, and I'm quoting. It says, The expert testimony, while credible, leaves us unpersuaded that there is sufficient presence of rare, endangered, or threatened bird species on the easement area. That's the first area, the endangered species. But what it seems like the tax court decision lacks is a standard, a clear reason standard for deciding whether a species was rare, endangered, or threatened, which is what we appear to require in feasel versus tropicana products. What's your response to that? Where's the standard? It seems like it reaches a conclusion but doesn't have a clear reason standard to rely on in order to make that determination. Sure, Your Honor. So I'll start with the bird species, which is maybe the most voluminous evidence that was put forth to the tax court. Sixty-some bird species were at issue in this case. The tax court was not required to give a litany of every single bird species. It discussed a sample of species that were at issue. And in the tax court's opinion, this is around page 24 to 25 of that opinion at document 64, the tax court focused on the following aspects of the evidence. It noted that many species were listed only by the Partners in Flight organization. Now experts for both sides testified that that organization includes common birds on its list. So many of them were listed only by Partners in Flight, including common birds. And all of those species were ranked by Partners in Flight in the lowest and second to lowest categories out of five. So that's one thing the court considered. Then the court looked to another list, the Atlantic Coast Joint Venture List, and noticed that the species listed there were primarily in the lowest category. So looking at all of the species, which we did in our brief, 13 species were listed by Atlantic Coast Joint Venture. Eleven of the 13 were in the lowest category. And the two that were not were in the lowest two categories for Partners in Flight, which includes common birds. So the court looked to the list provided by the conservation organizations, which is the evidence that Champions Retreat relied on. Didn't the court, it seemed to me reading the opinion, that they only analyzed birds that two people saw? Explain that to me. You've got somebody they say is credible who goes out there and does a study and says this bird is on this property, but the other guy doesn't see this bird, and so the tax court says we're not going to even pay attention to that. Is that okay? Yes, Your Honor. It's true that the tax court focused its analysis on the birds that were seen by two of the experts, and the court doesn't explain why it chose to do that. Can you think of any justification for that? Well, Your Honor, I think perhaps the court didn't want to go through the exercise of going through every single of 60-some bird species and was looking at a sample of the species, but it's true the court doesn't explain that. But importantly, Champions Retreat on appeal does not point to any way in which looking at the rest of the bird species shows that the tax court committed clear error in concluding that none of those species are rare, threatened, or endangered. Substantial evidence supports that conclusion with Dr. Noss testifying that none of the species are rare, threatened, or endangered. Certainly a qualified expert in the tax court was allowed to credit his testimony over the often conflicting evidence on these lists. But more importantly— I guess following up on my question, if there wasn't a golf course on this property, wouldn't this be a no-brainer for the taxpayer? I mean, if you had the same birds, the same animals, the same habitat, same environment, and there was no golf course, would there even be a problem? Well, Your Honor, there could be a couple of problems if they approached, in your hypothetical, the case in the same way that occurred here by focusing on the rare, threatened, or endangered species. With respect to the animal species, of course, the tax court found that there were no such species. And again, that's supported by substantial evidence through the testimony of Dr. Noss and by looking at where these birds are on these lists. And almost all of them are ranked quite low. The ones that are ranked higher are ranked low on at least one of the lists. So I think there would still be an issue with rare, threatened, or endangered species. The dense flower knotweed is a separate question. But I think there would still be this issue with the animal species. Now, there are other ways to qualify for this easement. One in particular that we point out in our brief, champions did not rely on. This is in the Treasury Regulation in Subsection D-3-2, which gives some examples of a significant habitat or ecosystem. And I'll note, as we do in our brief, that this section comes word for word from the House and Senate Committee reports that accompany the legislation enacting these conservation purposes. But there is the second example listed there, is natural areas that represent high-quality examples of a terrestrial community or aquatic community, such as islands that are undeveloped or not intensely developed, where the coastal ecosystem is relatively intact. So that might be another way for the property that you're describing to meet the requirement here. But champions did not set that out as a standard that they met? No, they did not. And I think perhaps one could see why, given the qualification of the example. High-quality examples of a terrestrial or aquatic community, such as islands that are undeveloped or not intensely developed. Given what we know about this golf course, it is not undeveloped, it is indeed intensely developed. I'll ask you the same question I was supposed to ask Council. What would your standard for relatively natural habitat be? Set aside significant, but what's your standard for relatively natural habitat? So interestingly, the tax court here did not reach the question of relatively natural. And it is a, I think at the end of the day, it's a factual question that would look at all of the facts and circumstances about a property. I know that doesn't give you a bright line to draw, but unfortunately I think it's necessary, because there are any number of kinds of properties that one could look at here. And setting a bright line would be quite difficult to do when we're talking about an undeveloped piece of property, a golf course, a rural area agricultural land that might be developed into small housing developments. I mean, I'm not even necessarily looking for a bright line. I'm looking for any line. Well, the court in this case heard testimony from experts about what natural means and where the line might be with relatively natural and the kinds of things that the court could consider in determining that. And so I think expert testimony might come into play there. But the regulation does not put meat on the bones of that particular phrase. It does provide examples of the significantly relatively natural habitats, and that could be a place to get some guidance about what relatively natural means. But there hasn't been, as far as I'm aware, a court that has wrestled with the relatively natural question. And what about the discussion of the scenic purposes? Do you know if the public who is at the state park across the river can see the conservation area from across the river? We don't know that, Your Honor. There's no testimony in the record. Are you talking about Sumter National Forest? So there's no testimony in the record from anybody standing in Sumter National Forest and looking across the river. Champion's Retreat claims that there is, but the site for that claim is witness talking about the fact that you can see Sumter National Forest from Champion's Retreat. So it's the opposite of that. Now, with respect to the scenic enjoyment issue, as we're talking about that, Champion's claims and focuses nearly exclusively on their argument that the easement area can be seen from canoes and kayaks in a couple of these rivers that go around the golf course. And the regulation provides that if only a small portion of the property is visible to the public, the public benefit may be insufficient to qualify it for the donation. And the tax court, based on the evidence before it, especially the fact that the riverbanks in the areas that we're talking about are up to 10 feet high, did not clearly err in finding that visual access to the property was insufficient to qualify. Don? Don, you still have as a—I did watch the videos that were in evidence, and I could see how even if a canoer is looking at the side of a riverbank and then sees all the trees in the background, isn't that more scenic than seeing a bunch of houses and docks? Your Honor, our position is that those videos were not, in fact, admitted into evidence. Champions Retreat argues in its brief that they were never excluded, but evidence, of course, must be admitted to be in the record as fact, evidence for trial. And these videos, in fact, never were. They were attached to the expert report of Keith Lawrence, and the tax court over and over again distinguished between the things that an expert can rely on, which includes evidence not in the record and factual evidence. But even if the video, and I didn't get it because Judge Grant had it, but even if the video is not in the record, doesn't it strike you as a make-weight to say that there's a 3-10-foot riverbank and so you can't see the property? I mean, I went down the Colorado River just short of the Grand Canyon, and they were pretty high, but it was a nice scene. So, Your Honor, there's actually no testimony in the record from anyone talking about being in a canoe or kayak going down this river and looking at Champions Retreat. The county planning director discussed that the area is scenic and pretty and that he enjoys canoeing in the area, but there is absolutely nobody talking about what one can see from a canoe. And getting back to the videos, even if there wasn't this issue with whether or not it's actually evidence, which, again, it's our position that it's not admitted into evidence, there's no testimony at trial regarding the creation of the video or how far off the river the camera was in taking the video. And when I watched the video, one thing that I noticed is that there's a distinct change in elevation for the camera. So there's one point where it's lower down and the camera pans, you can see very little, and then all of a sudden the camera goes up and you have a much greater view. So there simply isn't evidence at all, which is quite surprising, regarding what one can see from a boat on this river. Do you have a map in the record? Yes, Your Honor. What's the page for that? There are a couple of maps. So there are a number of maps. The ones I would refer you to are the following. There is a map of the easement. There's a few of them, but perhaps the easiest to find is attached to the easement itself, which is tab 42, exhibit 43J, and it's at the end of that exhibit. And that map shades out the parts that are in the easement, not including the housing development that's in the middle of the easement and some other areas. So that's one place. Really great maps, I think, that helped me get a sense of this area. They don't show the easement, but they show the holes in the golf course and that sort of thing. It's in tab 42, exhibit 54J, and there's a number of maps. I couldn't get a very good feel for what this conservation easement would prevent. So Judge Grant's question was better to see the trees than to see the condos. That strikes me as correct. What would happen if there wasn't this conservation easement? Would there be condos or some other development along this river? Well, seeing trees instead of condos, just to spend one moment on that, wouldn't be sufficient to qualify this for the scenic enjoyment provision. There's actually a number of factors in the record that the tax court didn't need to reach regarding scenic enjoyment because it found that the visual access was not sufficient. And I'll note that these rivers are on the far eastern side of the easement area. When you take a look at those maps, if you do that, you'll see that there's a significant portion of the easement that the rivers are nowhere near. In addition to that, there's some mention of trails that allegedly overlook the easement area. And at trial, the county planning director explained that the property he was on when he saw Champions Retreat was land the county was planning to acquire for trails and were not yet in existence at that point. I'm sorry, Your Honor, I've lost track of your question. I apologize. I think you answered it. I was just looking at what part of this easement would otherwise be available to develop. Well, so, Your Honor, that's actually a significantly important question on the subject of evaluation of the easement. There's a laundry list of issues that if this court reverses with respect to conservation purpose, the tax court will need to address, including relatively natural, including a number of things. But when parties talk about valuing one of these easements, that is a chief focus, is what else could be here. And so, you know, the court would look at zoning requirements. The court would look at the kinds of commitments that Champions Retreat has made to its owners to maintain a golf course there. It would look at a number of issues about what else could potentially be there. I take it it would be the difference in value of the property with and without the conservation easement at the time of the donation. Yes, Your Honor, that's correct. What are those factors that the court would look at in determining whether the exclusive purpose for the easement was conservation? Or what factors would the court consider when making that determination? So one thing that the statute particularly points out, and it's not the only thing that might be considered in thinking about exclusive purpose, is perpetuity of the easement. So that's one thing that Section 178 specifically points to with respect to exclusive purpose. But one moment on the dense flower, not weed, the tax court looked at the fact that that plant inhabits only 7.5% of the easement area. Now, the tax court also considered the fact that the easement does not, in fact, protect that area, which is a requirement because the course is designed to drain various chemicals into that habitat that experts from both sides said could be harmful to that plant. But setting that aside for a moment, in thinking about whether conservation was the purpose, or the exclusive purpose for this easement, it was proper for the tax court to consider the fact that the easement was 13 times the size of the habitat of the dense flower, not weed. And to ask the question, if the purpose is to protect this small area in which the dense flower, not weed, lives, which, by the way, would have a rather low value for a conservation easement being swamp land, why was the easement area 13 times larger than that? What about all the birds? And setting aside what we already discussed about them, why is the dense flower, not weed, the only species you would consider  Are you saying that we would need to conclude that the district court did not clearly err, or the tax court did not clearly err when it determined that the other species were not threatened, endangered, or rare? Yes, Joanna, that's correct. So the question is, is there substantial evidence to support the tax court's conclusion that none of those animal species, the birds or the squirrel, which we haven't talked about, but I'm happy to talk about if you'd like for me to, that none of those species were rare, threatened, or endangered? Actually, I know you're out of time, but I would like to hear about the squirrel if the presiding judge will permit it. So with respect to the southern fox squirrel, the tax court concluded that it is not considered, that it is not rare, endangered, or threatened. There's substantial evidence to support that conclusion. Dr. Nass testified in Doc 53 at page 624, and I quote, that the species is not considered rare, endangered, or threatened. In addition to that, NatureServe ranks it globally demonstrably secure in a G5 ranking. It is not ranked by the Georgia Natural Heritage Program, and it is legally and prolifically hunted in Georgia with an allowance of 12 per day for six months of the year, or 2,160 per year. So there's substantial evidence to support the tax court's conclusion that that species is not rare, endangered, or threatened. The reg says that significant habitats and ecosystems include but are not limited to those categories. Yes, Your Honor. So it includes significant, it includes habitats for rare, endangered, threatened species, but it certainly is not limited to threatened species. Why couldn't the fox squirrel enter the analysis even if it's not rare, endangered, or threatened? Well, Your Honor, you're right that the regulation provides some examples and that it's not an exclusive list. That's absolutely correct. In this case, Champions Retreat, until its efforts failed, argued that it met two of the specific examples in the regulation. It argued that the easement protected the habitats of rare, endangered, threatened species, and it made its arguments regarding Sumter National Forest, which we also haven't discussed, but I'd be happy to talk about it if the court would like for me to. So Champions never argued that it met that regulation for a reason not listed there. In fact, it focused all of its efforts with respect to significant, relatively natural habitat on those two examples. And we pointed out in our opening brief in a footnote that that was the case. We said, Champions Retreat relies on these two, and put a footnote and said, they have not claimed to meet that for any other reason. They've waived that argument. They didn't respond to that. Any other questions from the court? I think we have your argument. Thank you, Ms. Weidel. Thank you very much. I appreciate it. Thank you. Judge Grant, the standard that the tax court used was it had to be a G2 species or less. And the tax court relied on an earlier decision called Atkinson, and in that decision, and we cited this quote in the brief, a species listed as just one level above demonstrably secure is not rare, threatened, or endangered enough. The species at issue in that case was the G3 species, Venus flytrap, which the government's expert in our case is petitioning to have put on the threatened and endangered species list, which is odd. In our case, he thought it was endangered, but for the tax court it wasn't rare, threatened, or endangered in that case. So that's the standard that the court has made. In audits right now, I'm being asked, well, does your property have a G2 species on it? So the government's taking the position that unless we have a G2 species on a piece of property, it does not qualify under the habitat regulation. But that's not the issue you have to decide here because there's significant threatened species. Dr. Noss admitted, again, he only looked at rare. So the court has not looked at threatened species. And in response to the bird conversation, I'd like to point out that Mr. Wilson believed that the Atlantic Coast Joint Venture was the appropriate database to use as a starting point for testing the threat level of species on the property. On the property, there was one species that was listed at the highest threat level. It's the eastern whippoorwill. It's requiring immediate attention, including recovery. There was one high species, the brown-headed nuthatch, which it's defined in that level as needing immediate attention because of external threats. And there were 11 moderate species on the property listed under the Atlantic Coast Joint Venture. And the moderate level is defined as species that are declining but subject to less serious threats. They're subject to threats. They are threatened. They are a threatened species. He also looked at the North American Bird Conservation Initiative. They only have two levels. So if we have to get on a level above the lowest level, there's no level to go to because that was sort of how the court analyzed it. You have to have two people see an already rare species, 20 or less, and it has to be widespread over the area. That is not a standard that any piece of property is ever going to meet. We had three species on the property that were on the yellow list. The definition of the yellow list, when you get on the yellow list, is a species that are range-restricted or suffering widespread declines with high threats. High threats. These species are highly threatened. Dr. Noss didn't consider any of the birds because he said they weren't rare. There was more than 20 of them on the planet, so he didn't consider them. The three yellow species listed are the eastern whippoorwill, the prothonotary wobbler, and the red-headed woodpecker, which Dr. Noss admits in his expert report, he saw an abundance living on the edge. They're an edge species. They need the golf course to survive. They need the manicured portions of the golf course that mimic a pine savanna to survive. We had two species on the property that are listed by the U.S. Fish and Wildlife Commission's 2008 list because they are likely to be placed on the threatened and endangered species list. So we can't just look at rare species. I want to address the admission of the video. Mr. Lawrence's expert report was admitted into evidence, and those videos were exhibits to his expert report, so they were admitted into evidence. As for maps, there is an excellent map of the easement area that's in Mr. Lawrence's expert report. It's at tab 33. So the video relates to the purpose to preserve open space and the scenic enjoyment to the general public? Yes, Your Honor. Is that the one? Yes, Your Honor. Is that the video? Is that the evidence that is in the record that supports that purpose? Is there anything else? We had testimony from the Columbia County Planning Director. He testified about paddling along the Yuki Creek. He was looking at some property along the Yuki Creek, and he didn't realize he was looking at Champion's Retreat in the distance. There was that testimony. Mr. Echols, in his expert report, discussed the extensive areas from which you can view the property. He actually measured the distance along the Savannah River, Yuki Creek, and the Little River, and there's over a mile and a half of visual access from the rivers. As for not being able to see over the top of the riverbank, Mr. Lawrence, who was accepted as an expert engineer, testified all you have to do is kind of paddle towards the middle of that 700-foot river, and you're not going to have any problems seeing over the side. In the tab 33, it contains Mr. Lawrence's expert report 96P, and exhibit 10 is an excellent visual of the Eastman area. I don't believe the appendix has a color version, but the tax court has sent a color version up to the court. Yes, Judge Henkel, if the owners of this property, if Mr. Pollard and Mr. Maybaum had wanted to develop this property, they could have made a lot of money. In 2010? Oh, yes. Oh, yes, even in 2010. This property is highly valuable. In fact, the government's own internal expert rendered an opinion that the highest and best use of this 27-hole golf course would be to develop the nine holes on the bluff overlooking the river, and he came up with a nice value for the property even for that time. But it was important to these members of the Augusta community to protect this area along the river, and there was testimony in the record to that effect, but that wasn't one of the issues on appeal, so we haven't included that in the appendix. If the court remands the case, then it would go back to the tax court to make those decisions. At trial, they didn't use their internal appraiser. They brought in a golf course appraiser who said that the highest and best use would be to keep it as a 27-hole golf course, continuing to lose money. If there are no other questions? I think we have your argument. Thank you, counsel. Thank you so much. And the court will be in recess until 9 o'clock tomorrow morning.